IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARC ALAN REICHBART, Individually and on Behalf of All Others Similarly Situated,

                                Plaintiff,

                 v.

H. RUSSELL FRISBY JR., PATRICK T. HARKER, JACK B. DUNN, IV, TERENCE C. GOLDEN, BARBARA J. KRUMSIEK, PAUL M. BARBAS, PATRICIA A. OELRICH, LAWRENCE C. NUSSDORF, JOSEPH M. RIGBY, LESTER P. SILVERMAN, PEPCO HOLDINGS, INC, EXELON CORPORATION, and PURPLE ACQUISITION CORP.,

                              Defendants.

No:

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

## COMPLAINT FOR VIOLATIONS OF §§14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT

Plaintiff Marc Alan Reichbart, by his attorneys, alleges upon personal knowledge as to their own acts and upon information and belief premised on the investigation of his counsel as to all other matters, as follows:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this action individually and as a class action against Pepco Holdings, Inc. ("Pepco" or the "Company") and members of the Pepco Board of Directors (the "Board" or the "Individual Defendants") arising out of their violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, for the dissemination of a false and misleading

proxy statement in connection with the proposed sale of Pepco to Exelon Corporation ("Exelon").   Further, Plaintiff alleges violations of state law against the Defendants (defined herein) arising out of breaches of fiduciary duties in connection with the Proposed Transaction.

2.     On April 30, 2014, Pepco and Exelon jointly issued a press release announcing that they had signed a definitive agreement and plan of merger ("Merger Agreement") to combine the two companies in an all cash transaction which had been approved by both the Board and Exelon's board of directors (the "Proposed Transaction").   The Proposed Transaction anticipates Pepco being purchased by Exelon and its affiliate, Purple Acquisition Corp. ("Merger Sub" and together with Exelon "Exelon").   Pursuant to the Merger Agreement, each outstanding share of Pepco common stock will be converted into the right to receive $27.25 per share in cash (the "Offer Price") in a transaction valued at $6.8 billion.

3.     The Proposed Transaction is the product of a flawed process designed to tilt the sale of the Company in favor of Exelon at the expense of other bidders and without the benefit of a proper auction process designed to drive up the sales price.   The Offer Price is insufficient given Pepco's assets and operations, and also because the Proposed Transaction represents a change in corporate control for which the Company's public stockholders are entitled to a significant premium.

4.     Rather than undertake a full and fair auction to maximize stockholder value as their fiduciary duties require, the Individual Defendants agreed to a number of strict deal protection devices in the Merger Agreement.   Those deal protection devices will preclude a fair sales process for the Company and lock out competing bidders, and include:   (i) a "no-solicitation" clause that severely limits the Board's ability to communicate and negotiate with potential third parties who wish to submit a bid or who have submitted an unsolicited bid; (ii) an

"information rights" provision requiring the Company to disclose to Exelon, within twenty-four hours, all confidential information regarding any alternative proposal it may receive, including the identity of the bidder; (iii) a "matching rights" provision granting Exelon three business days to match any competing proposal made to the Company (making it much less likely that a third party will submit a bid knowing that Exelon need only match it); and (iv) a termination fee provision requiring the Company to pay Exelon up to $293 million plus Exelon's expenses up to $40 million if the Proposed Transaction is terminated in favor of a superior proposal under specified terms.   These preclusive deal protection devices make it extremely unlikely that another bidder will emerge that is willing to take on the significant time and expense required to engage in the sales process.

5.      In an attempt to secure stockholder support for the Proposed Transaction, on July 21, 2014, Board members issued and filed with the SEC a materially false and misleading Proxy Statement on Schedule 14A (the "Proxy Statement").  The Proxy Statement, which recommends Pepco common stockholders vote for the adoption of the Merger Agreement, omits and/or misrepresents material information which will preclude Pepco's stockholders from casting an informed vote on the Proposed Transaction.  The Proxy Statement omits a number of material facts necessary to make the statements contained therein not misleading, including, *inter alia*:  (i) the process undertaken by the Board leading to the Merger Agreement; and (ii) the inputs and data underlying the financial analyses of both the Company's and the Board's financial advisors in support of the Offer Price.  Accurate information in the Proxy Statement is critical to the Company's stockholders – not least because the Board undertook a flawed sales process that failed to develop a reliable market price for the sale of the Company.  As such, Defendants'

actions threaten stockholders with irreparable harm for which money damages are not an adequate alternate remedy.

6.      Therefore, Plaintiff seeks injunctive relief to ensure that Defendants cure their violations of §§14(a) and 20(a) of the 1934 Act, and that Defendants are not permitted to seek stockholder approval of the Proposed Transaction without complying with their duties under the federal securities laws and their fiduciary duties under state law to maximize the value of the Company in a sale and to provide stockholders with all material information about the sales process, the Offer Price, and the Company's value.

## JURISDICTION AND VENUE

7.      The claims herein (as to Counts I and II) arise under §§ 14(a) and 20(a) of the 1934 Act. This Court has jurisdiction over the claims asserted herein pursuant to § 27 of the 1934 Act and supplemental jurisdiction under 28 U.S.C. § 1367.

8.      This Court has jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants, including Pepco, either resides or maintains executive offices in the District, and a substantial portion of the transactions and wrongs that are the subject of this complaint occurred in the District.

## PARTIES

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Pepco common stock.

11.     Defendant Pepco is a Delaware corporation headquartered at 701 Ninth Street, N.W., Washington, DC 20068.  The Company specializes in the delivery of electricity and natural gas energy in the Mid-Atlantic region.  Pepco's common stock is traded on the NYSE under the ticker symbol "POM."

12.     Defendant H. Russell Frisby Jr. ("Frisby") is a Pepco director and has served as such since 2012.  Frisby is a member of the Compensation/Human Resources Committee and the Finance Committee.

13.     Defendant Patrick T. Harker ("Harker") is a Pepco director and has served as such since 2009.   Harker is a member of the Audit Committee and is Chairman of the Compensation/Human Resources Committee.

14.     Defendant Jack B. Dunn, IV ("Dunn") is a Pepco director and has served as such since 2004.  Dunn is a member of the Compensation/Human Resources Committee and the Corporate Governance/Nominating Committee.

15.     Defendant Terence C. Golden ("Golden") is a Pepco director and has served as such since 2002.  Golden is a member of the Audit Committee and the Finance Committee.

16.     Defendant Barbara J. Krumsiek ("Krumsiek") is a Pepco director and has served as such since 2007.  Krumsiek is a member of the Compensation/Human Resources Committee and the Finance Committee.

17.     Defendant Paul M. Barbas ("Barbas") is a Pepco director and has served as such director since 2013. Barbas is a member of the Compensation/Human Resources Committee and the Finance Committee.

18.     Defendant Patricia A. Oelrich ("Oelrich") is a Pepco director and has served as such since 2010.  Oelrich is Chairperson of the Audit Committee and a member of the Corporate Governance/Nominating Committee.

19.     Defendant Lawrence C. Nussdorf ("Nussdorf") is a Pepco director and has served as such since 2002.   Nussdorf is a member of the Audit Committee, the Corporate Governance/Nominating Committee, and the Executive Committee.

20.     Defendant Joseph M. Rigby ("Rigby") is a Pepco director and has served as Chairman of the Board, President, and Chief Executive Officer ("CEO") since 2009.  Rigby is a member of the Executive Committee.

21.     Defendant Lester P. Silverman ("Silverman") is a Pepco director and has served as such since 2006.  Silverman is a member of the Compensation/Human Resources Committee, the Executive Committee, and is Chairman of the Finance Committee.

22.     The Defendants named above in ¶¶ 12 - 21 are sometimes collectively referred to herein as the "Individual Defendants."

23.     The Individual Defendants, as officers and/or directors of the Company, owe fiduciary duties of loyalty, good faith, due care, and full and fair disclosure to its public stockholders.   As alleged herein, they have breached their fiduciary duties by, among other things, failing to maximize stockholder value in a proposed sale of the Company.

24.     Each of the Individual Defendants at all relevant times had the power to control and direct Pepco to engage in the misconduct alleged herein.   The Individual Defendants' fiduciary obligations required them to act in the best interests of Plaintiff and all Pepco's public stockholders. The Individual Defendants are acting in concert with one another in violating their fiduciary duties as alleged herein, and, specifically, in connection with the Proposed Transaction.

25.     The Company's public stockholders must receive the maximum value for their Company shares through the Proposed Transaction.  Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are continuing to violate, the fiduciary duties they owe to Plaintiff and the Company's other public stockholders, due to the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

26.     Defendant Exelon is a Pennsylvania corporation with its principal executive office located at 10 South Dearborn Street, Chicago, Illinois, 60680.  Exelon is a utility services holding company engaged in the energy generation and energy delivery businesses.

27.     Defendant Merger Sub is a Delaware corporation and wholly-owned subsidiary of Exelon.  Merger Sub was established to facilitate the Proposed Transaction.

28.     Collectively, Pepco, the Individual Defendants, Exelon, and Merger Sub are referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all public holders of Pepco stock as of April 30, 2014, the date the Merger Agreement was announced (the "Class"), who are being and will be harmed by Defendants' actions described below.  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendants.

30.     Plaintiff's claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

31.     The Class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable.  According to recent filings with the SEC, Pepco has

approximately 250 million shares outstanding, likely owned by thousands of stockholders of record scattered throughout the United States.

32.     There are questions of law and fact which are common to the Class and which predominate over any questions affecting any individual members.   The common questions include, *inter alia*, the following:

a)      Whether the Individual Defendants have and are breaching their fiduciary duties of loyalty and due care with respect to Plaintiff and the Class in connection with the Proposed Transaction;

b)      Whether the Individual Defendants have and are breaching their fiduciary duties by not securing and obtaining the best price reasonable under the circumstances for the sale of Pepco and, instead, will allow the valuable assets of Pepco to be acquired by Exelon at an unfair and inadequate price;

c)      Whether the Proxy Statement contains false and misleading statements and omits material information about the Proposed Transaction necessary for Pepco stockholders to be fully informed when deciding whether or not to vote in support of the Proposed Transaction;

d)      Whether Pepco, Exelon, and Merger Sub have aided and abetted the breaches of the fiduciary and other common law duties owed by the Individual Defendants to Plaintiff and the Class; and

e)      Whether Plaintiff and the Class will be irreparably harmed if the Proposed Transaction is not enjoined.

33.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the

Class and Plaintiff has the same interest as the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

34.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class. Further, the prosecution of separate actions would possibly establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

35.     Defendants have acted, or refused to act, on grounds generally applicable, and are causing injury to, the Class and, therefore, final injunctive relief on behalf of the Class as a whole is appropriate.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     The Individual Defendants owe Pepco and its stockholders fiduciary obligations of good faith, loyalty, and candor, and are required to use their utmost ability to control and manage Pepco in a fair, just, honest, and equitable manner.

37.     By virtue of their fiduciary positions, the Individual Defendants are required to: (a) act in furtherance of the best interests of Pepco's stockholders; (b) maximize stockholder value in a sale of the Company; (c) heed the expressed views of Pepco's stockholders; and (d) refrain from abusing their positions of control. To comply with their fiduciary duties, the Individual Directors are prohibited from taking any action that:

a.      adversely affects the value provided to the Company's stockholders;

b.    will discourage, inhibit, or deter alternative offers to purchase control of the Company or its assets;

c.    contractually prohibits themselves from complying with their fiduciary duties;

d.    will otherwise adversely affect their duty to secure the best value reasonably available under the circumstances for the Company's stockholders;

e.    will provide them with preferential treatment at the expense of, or separate from, the Company's public stockholders;

f.    divides loyalties owed to stockholders;

g.    results in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public stockholders of the corporation; and/or

h.    unjustly enriches themselves at the expense of or to the detriment of the Company's public stockholders.

38.    Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties and aiding and abetting such breaches owed to Plaintiff and the Class. The Offer Price is inadequate, and as a result of the Individual Defendants' self-dealing and divided loyalties, neither Plaintiff nor the Class will receive adequate or fair value for their Pepco common stock in the Proposed Transaction. Further, Defendants have failed to adequately disclose information about the Proposed Transaction to the Company's stockholders in filings with the SEC.

## SUBSTANTIVE ALLEGATIONS

Background of the Company

39.     Pepco is a holding company that was incorporated in Delaware in 2001. According to the Company's latest annual proxy filed with the SEC on July 21, 2014, Pepco, through its regulated public utility subsidiaries, is engaged primarily in the transmission, distribution, and default supply of electricity, and to a lesser extent, the distribution and supply of natural gas.  The Company distributes energy primarily in the Mid-Atlantic region, including Maryland and the District of Columbia.

40.     In recent months the Company has performed well, which is reflected in the Company's public announcements.  On March 21, 2014, the Company filed with the SEC a 2014 Analyst Conference entitled "Well Delivered To Position Growth" (the "Conference Report"). The Conference Report lauded both the Company's past and anticipated performance.  For example, page 5 of the Conference Report noted that the Company was "Well Positioned to Deliver Value" and extolled the Company's "Strong balance sheet, ample liquidity and solid grade ratings" stating, in pertinent part:



41.     Page 7 of the Conference Report further extolled the anticipated performance of the Company, stating, in pertinent part:



42.     Similarly, on November 6, 2013 the Company issued a press release announcing the Company's third quarter 2013 financial results, revealing increases in adjusted net income and containing statements by Chairman, President, and CEO Rigby lauding the Company's operational outlook.  The press release stated, in pertinent part:

> "Our third quarter results reflect the positive impact of our continued investment in utility infrastructure," said Joseph M. Rigby, Chairman, President and Chief Executive Officer.  "Over the next five years, we expect to spend $5.8 billion on additional investments aimed at replacing aging infrastructure and installing advanced technologies."  Rigby added, "While we remain committed to system reliability and improving the customer experience, we expect timely cost recovery and the opportunity to earn reasonable rates of return on Pepco Holdings' extensive investments.  To that end, we continue to be active in the regulatory arena.   Last month, the Delaware Public Service Commission approved a settlement agreement in Delmarva Power's gas distribution base rate case and initiated a proceeding to consider a unique Forward Looking Rate Plan proposed by Delmarva Power which would establish electric rates over a multi-year period. We are beginning the next cycle of rate cases, and due to the most recent base rate case outcomes for both Pepco in Maryland and Atlantic City Electric in New Jersey, new rate cases will be filed by the end of 2013 in these jurisdictions."
>
> The increase in adjusted net income from continuing operations (Non-GAAP) in the third quarter of 2013, as compared to the 2012 quarter, was driven by higher electric distribution revenue (primarily due to higher rates driven by increased infrastructure investment) and lower operation and maintenance expense. Partially offsetting these positive factors was lower weather-related sales in our service territories that do not have revenue decoupled from sales.
>
> The primary drivers of the increase in adjusted net income from continuing operations (Non-GAAP) for the nine months ended September 30, 2013, as compared to the 2012 period, were higher electric distribution revenue (primarily due to higher rates driven by increased infrastructure investment) and lower operation and maintenance expense. Lower default electricity supply margins due to a favorable adjustment in the prior year and higher interest expense partially offset the increase for the period.

43.     Shortly thereafter, on January 27, 2014, the Company announced that Rigby would be departing Pepco in 2015.

The Flawed Sales Process Leading up to the Merger

44.    While the Proxy Statement is misleading and omits pertinent facts related to the value of the Company and the actions of the Board, it does nevertheless reveal a sales process that improperly tilted the sale of Pepco in favor of Exelon and deterred a proper auction process designed to maximize the value of the Company for its public stockholders.  Aspects of the improper process undertaken by the Board include the use of standstill agreements to limit an auction process and the maximization of shareholder value.  In fact, the Proxy Statement reveals that it was Exelon who initiated the sales process after Rigby announced his intention to retire from Pepco at the end of 2014, and ultimately it was Exelon who prevailed as buyer of the Company.

45.    According to the Proxy Statement, Exelon, through President and CEO Christopher M. Crane ("Crane"), approached Rigby on January 28, 2014 about possibly buying the Company, the day after Rigby had announced his intention to step down from his position as Company President and CEO.  During a dinner between Rigby and Crane on February 5, 2014, Crane discussed the possibility of a transaction with Pepco at approximately $22 per Pepco share.

46.    According to the Proxy Statement, on February 4, 2014, an entity identified as Bidder A also expressed an interest in a "possible transaction" with Pepco.

47.    The Proxy Statement reveals that Rigby shared information about these initial approaches only with "certain members of senior management and certain members of the Board," but it was not until after follow up phone calls with both Exelon and Bidder A that Rigby informed the entire Board about these inquiries on February 20, 2014.

48.    A week later, on February 26, 2014, the Board discussed with Lazard Frères & Co. LLC ("Lazard") other strategic options in addition to the sale of the Company.  Without

indicating whether or not Lazard had been officially engaged to act as the Board's financial advisor, the Proxy Statement reports, in a cursory manner, that other options considered included pursuing Pepco's long-term business plan, a strategic transaction, or engaging with other possible strategic and financial counterparties.

49.     At the end of February 2014, the Board decided to contact just six additional strategic counterparties, purportedly to gauge their interest in a "possible" strategic transaction and to request an "indication of their interest." The Board termed this part of the sales process "Phase I." The Proxy Statement fails to state why the Board authorized its advisors to contact only six additional entities and on what basis, how many other entities were identified as potentially interested parties, or why the advisors were authorized to contact only strategic purchasers rather than private equity purchasers as well.

50.     Having limited the process to just eight potential bidders, the Board then chose to further limit the process by having all eight purported candidates sign a "don't ask, don't waive" standstill provision prohibiting the candidates from submitting a proposal unless asked to do so by Pepco. The "don't ask, don't waive" provision, while in effect, substantially limited the ability of potential bidders to actively interact in the process. Because the purpose of Phase I was to determine, after limited due diligence and based on "price and commitment to obtain regulatory approvals," whether to continue pursuing a strategic transaction with these parties, such a provision was inappropriate while the sales process was still in Phase I.

51.     Consequently, the "don't ask, don't waive" provision improperly limited the entire sales process. Only five bidders emerged from the Phase I stage of the sales process, identified in the Proxy Statement as Bidders B, C, D, E, and Exelon. On March 27, 2014, all of the Bidders submitted indications of interest at or nominally close to $24 per Pepco share, with

the exception of Bidder D, who submitted an indication of interest of $26 per Pepco share. According to the Proxy Statement, the Board only chose to proceed to "Phase II" of the sales process with Bidder D and Exelon, which, due to the "don't ask, don't waive" provision, had the effect of entirely excluding Bidders B, C, and E from the process absent permission from Pepco to re-submit a higher bid. The Proxy Statement suggests Bidder E was considered by the Board to face "operating and regulatory issues," but provides no reason why Bidders B and C were excluded from the process when they had submitted bids comparable to Exelon.

52.    In April 2014, Pepco discussed terms of a merger agreement with both Exelon and Bidder D and provided further additional non-public information to each. The Proxy Statement further states that "each of Exelon and Bidder D had indicated a preference to have Mr. Rigby remain as Chairman, President and Chief Executive Officer of PHI [Pepco] through completion of any merger transaction" and that this "preference" was communicated to a Compensation Committee of the Board on April 18, 2014. This creates questions of conflict regarding the continued role of Rigby throughout the merger process and the financial implication thereof. Although Rigby had already announced his intention to retire, he subsequently was involved in a merger process that seems to have resulted in an extension of his employment (the deal is not expected to close until the third quarter of 2015) and the receipt of millions of dollars in merger related payments.

53.    Subsequently, Phase II of the sales process was improperly tilted in favor of Exelon. The Proxy Statement reveals that on April 25, 2014, Pepco received proposals from each of Exelon and Bidder D of $27.00 and $26.50 per share in cash respectively, and that at a Board meeting on April 27, 2014, the Board was advised of the "significant competition between Exelon and Bidder D." Nevertheless, despite the advantage that could be gained from this

16

"significant competition," the Board was also informed by Rigby that at an April 26, 2104 meeting among certain members of senior management and outside legal and financial advisors:

> senior management and the outside advisors agreed with a proposed strategy of *accelerating the process to reach final agreement with Exelon,* as the bidder presenting both the highest price and best proposed contractual terms at the time, and given the risk to the process from public disclosure or speculation regarding a potential transaction, but continuing to negotiate strongly for the best possible contractual protections around transaction certainty from both bidders and remaining open throughout to the possibility of obtaining higher prices from Exelon and Bidder D.   Mr. Rigby also discussed a subsequent telephone conversation on April 26, 2014 with representatives of Morgan Stanley and PHI's Lead Independent Director with respect to the foregoing strategy in which they agreed with the strategy.

(Emphasis added.)

54.     In other words, despite the significant competition building between Exelon and Bidder D, Rigby favored accelerating the process towards a deal with Exelon, rather than pursuing a course of action that would take advantage of the competition to secure a higher offer. Subsequently, the Board agreed with Rigby to accelerate the process in favor of Exelon, purportedly after "a thorough discussion with senior management and its advisors" in which they agreed that the alternative "of accelerating the timing for reaching final agreement with both Exelon and Bidder D" would be impractical to achieve.  Moreover, while Rigby indicated to Crane on April 26, 2014 Pepco's desire to accelerate the timetable for entering in to the merger to April 29, 2014, the Board agreed with senior management and Pepco's advisors that if Bidder D "ended up having the more attractive proposal, [Pepco] would defer final action on that proposal until May 2, 2014."

55.     The Proxy Statement fails to disclose why the Board viewed a "simultaneous" auction as impractical – a critical omission.  The decision to forego a "bidding war" between two interested parties relates directly to the Board's duty to maximize value to the Company's

stockholders.  Therefore, the Proxy Statement must disclose the reason why the Board eschewed a fully developed auction between Exelon and Bidder D at this time.

56.     Tellingly, the next day, on April 28, 2014, Bidder D contacted Rigby to inquire as to "what level of price increase was necessary for Bidder D to be the highest bidder."  In other words, Bidder D was still interested in pursuing the auction process.  Rigby responded by asking for Bidder D's "best and final" price, a request that seems designed not to stimulate the auction process but to end it.  Bidder D replied with $27.00 per share.  From the Proxy Statement it appears this was *the last communication* the Company had with Bidder D.  Thereafter, Rigby asked Crane for Exelon's "best and final price" which elicited an offer $27.25, the Offer Price.  Although these two bids were only $0.25 apart, it appears that neither party was given the opportunity to provide a counteroffer.

57.     The Board subsequently approved the Proposed Transaction with Exelon at the Offer Price.  Of course, by entering into to the "don't ask, don't waive" agreement, Bidder D was prevented from countering against the Offer Price on its own accord, and Pepco did not ask for another bid.  Therefore, despite the "significant competition" between Exelon and Bidder D, and despite Bidder D's strong interest in buying Pepco, Bidder D was shut out of the process after providing only two bids.

58.     Moreover, the Merger Agreement specifically targets Bidder D for additional punitive treatment should the Board ultimately conclude a transaction with Bidder D.  Page 33 of the Proxy Statement reveals that the Termination Fee of $259 million payable by Pepco to Exelon in the event the Board accepts a superior proposal *increases* to "$293 million if the superior proposal is made by Bidder D."  The Merger Agreement reveals that this higher termination fee is further increased by up to $40 million to account for expenses incurred by

18

Exelon should Bidder D submit a winning bid.  In other words, the deal protection terms agreed to by the Board improperly stifle competitive bids and were specifically strengthened to prevent a superior bid being made by Bidder D, the one party known to be interested in making an alternative bid.

59.     According to the Proxy Statement, Rigby informed the Board at its April 29, 2014 meeting that the purpose of the meeting was to discuss and consider a proposed transaction with Exelon *only*.  The Board was not even given the opportunity to discuss the pros and cons of a transaction with Bidder D as opposed to Exelon at its final meeting before approving the Merger. Further, Crane was invited to participate in this meeting to address "Exelon's regulatory commitments in connection with the Merger."  Bidder D was afforded no such opportunity.

60.     Also on April 29, 2014, the Board waived the "don't ask, don't waive" standstill provisions entered into by Bidders B, C, and E, and each party was informed of such by letter that day.[1]  Bidder D, however, was afforded no such waiver.  In fact, the Merger Agreement specifically prohibits the Board from waiving the "don't ask, don't waive" standstill provision entered into with Bidder D absent a Board determination that not to do so would violate its fiduciary duties – essentially meaning that the Board requires Exelon's consent for this provision to be waived.  By giving up control of the "don't ask, don't waive" standstill provisions in such circumstances, the Board improperly abdicated its fiduciary duties to manage the sale of the Company in the best interests of the Company's public stockholders.

The Proposed Transaction

61.     On April 30, 2014 the Company and Exelon issued a joint press release announcing the Proposed Transaction.  The press release stated, in pertinent part:

---

[1] These provisions were not waived until *after* the Proposed Transaction had already been unanimously approved by the Board and the letters were likely not received until after the Company had already entered into the Merger Agreement.

**CHICAGO and WASHINGTON, D.C. (April 30, 2014)** — Exelon Corporation (NYSE: EXC) and Pepco Holdings Inc. (NYSE: POM) today announced that they have signed a definitive agreement to combine the two companies in an all-cash transaction. The agreement, which has been unanimously approved by both companies' boards of directors, brings together Exelon's three top-performing electric and gas utilities – BGE, ComEd and PECO – and Pepco Holdings' electric and gas utilities – Atlantic City Electric, Delmarva Power and Pepco – to create the leading Mid-Atlantic electric and gas utility.

The combined utility businesses will serve approximately 10 million customers and have a rate base of approximately $26 billion. The transaction will further expand Exelon's regulated holdings, ensuring a balanced earnings mix as power prices recover.

Exelon President and CEO Chris Crane said, "Exelon and Pepco Holdings have a compelling strategic rationale for merging, given our geographic proximity and similar utility business models. Our cultures are an excellent match, with a shared focus on operational excellence, environmental stewardship, customer service and support for the communities we serve."

Pepco Holdings Chairman, President and CEO Joseph M. Rigby, said, "This combination provides significant benefits for all of our stakeholders, including customers, employees and shareholders. Exelon is one of the most respected energy companies in the country, and it is committed to building on the progress our team has made over the last few years to improve system reliability and customer satisfaction. As part of this transaction, Exelon has committed to provide what our customers most want: investments in infrastructure improvements, continuation of our long tradition of philanthropy in our communities and direct customer benefits of $100 million. Our shareholders will benefit from an immediate cash premium, and employees should enjoy even more opportunities as part of a larger company."

Rigby added that being part of a family of large urban utilities with distinguished emergency response capabilities will be of enormous value to the Pepco Holdings utilities and their customers during major storms.

**Commitment for Increased Reliability**

As part of the acquisition, Exelon and Pepco Holdings have committed to build on the significant improvements to service reliability that Pepco Holdings has already achieved for Atlantic City Electric, Delmarva Power and Pepco customers.

This commitment is backed by the strong reliability performance of the current Exelon utilities. ComEd and PECO are delivering first-quartile performance, and BGE's reliability metrics have risen to their best-ever levels since BGE joined Exelon in 2012 and are just shy of first quartile.

**Other Benefits to Electric and Gas Customers**

In addition to reliability improvements, upon completion of the transaction, Exelon will provide an aggregate $100 million – equivalent to approximately $50 per customer – for a Customer Investment Fund to be utilized across the Pepco Holdings utilities' service territories as each state public service commission deems appropriate for customer benefits, such as rate credits, assistance for low income customers and energy efficiency measures.

Exelon has also pledged to maintain charitable contributions in the Pepco Holdings service territories at Pepco Holdings' highest-ever level for at least a decade, a total commitment of $50 million.

**Terms of the Transaction**

The all-cash transaction consideration of $27.25 per share represents a 24.7 percent premium to Pepco Holdings' closing price of $21.85 on April 25, 2014, and a 29.5 percent premium to the volume–weighted average share price over the last 20 trading days (ending April 25, 2014).

The acquisition is anticipated to be significantly accretive to Exelon's adjusted earnings in the first full year after closing.

*     *     *

**Leadership and Headquarters**

Crane will remain president and CEO of the combined company. Rigby, who previously announced his planned retirement, will remain in his current roles with Pepco Holdings until the closing of the transaction.

62.     The announcement of the Proposed Transaction immediately drew comment from industry analysts, including at *The Motley Fool*, who, described how the Proposed Transaction represents a tremendous acquisition for Exelon. The June 19, 2014 article noted that the Proposed Transaction promised substantial synergies and that Exelon would be in a position to benefit from Pepco's attractive rate base growth. The article stated, in pertinent part:

**Planned Acquisition of Pepco Holdings to Be a Game-Changer for Exelon Corp.**

Utility stocks have remained popular among dividend-hunting investors as they offer attractive yields. **Exelon** (NYSE: EXCEXCEXC) is among the leading utility companies in the U.S., with exposure to both regulated and unregulated operations, and offers a yield of 3.5%. The company has announced plans to

acquire **Pepco** (NYSE: POM)POMPOM to increase the exposure to regulated operations and to lower earnings uncertainty.

Utilities, including Exelon and **Duke Energy** (NYSEDUKDUK: DUK), have been taking measures to increase their regulated business exposure, as the earnings and cash flows of unregulated operations remain weak and volatile because of uncertain forward-power prices, which are determined through auctions. Mergers and acquisitions, long-term price contracts and the sale of unregulated generation assets are the various options being considered by companies to reduce unregulated operations exposure.

Exelon's performance in recent years has remained challenged because of weakness in commodity and forward power prices, which put pressure on margins and cash flows and resulted in volatile earnings. As a result of the weakness in the unregulated power market, Exelon slashed its dividends by more than 40% in the first quarter of 2013.

Exelon has announced its plans to acquire Pepco for $6.8 billion at a share price of $27.25 in an all-cash transaction.

*        *        *

The acquisition will help Exelon increase its regulated operations; earnings contribution of regulated operations will increase to 60%-65% from the current level of 55%-60%. The company's management disclosed that it does not have any specific target for the level of contribution to earnings from regulated operations. As Exelon's exposure to regulated operations will increase, it will provide more revenues, earnings, and cash flow stability. Also, the increase in regulated exposure will help the company lower its risk profile and will augur well for the stock valuation.

**Benefits of synergy**

The geographically close operations and Mid-Atlantic presence of both Pepco and Exelon will also result in cost savings. Exelon expects the transaction to be immediately accretive to earnings and is expecting $0.15-$0.20 accretive to earnings post-2016. Also, the company expects to realize net synergies of $250 million over the first five years, with 40% to be retained by the company. As Exelon has extracted a lot of synergies from its operations post the Exelon-Constellation merger in 2012, now most of the savings will be derived through a reduction in Pepco's operational and maintenance (O&M) expenses.

Also, Exelon's regulated rate base growth will improve in the future as a result of Pepco's acquisition; Pepco has an attractive regulated rate base growth of almost 8% per annum through 2018. The acquisition will add Pepco's $8.3 million rate base to Exelon's regulated rate base; Exelon has already planned to spend $15 billion on its regulated operations over the next five years. The transaction will

increase Exelon's regulated rate base, will provide earnings growth, and will ensure earnings and cash flow stability.

*     *     *

**Final take**

Exelon's planned acquisition of Pepco will allow the company to increase its revenue stability and reduce volatility in earnings and cash flows. The transaction will also improve Exelon's dividend stability, which in the past has remained questionable. Exelon will also benefit from net synergies, which will be accretive to EPS in the future. Moreover, the company's risk profile will improve as a result of increased regulated business operations.

63.     The Proposed Transaction is anticipated to be significantly accretive to Exelon's adjusted earnings in the first full year after closing.

64.     The $27.25 Offer Price represents an inadequate premium to Pepco's stockholders. Pepco traded as high as $23.25 on April 29, 2014, the day before the announcement of the Proposed Transaction, and as high as $27.92 on July 8, 2014, subsequent to the announcement of the Proposed Transaction.

The Merger Agreement

65.     The Merger Agreement contains terms designed to protect the Proposed Transaction and deter alternative bids, even those that might increase the consideration paid to the Company's public stockholders. In the context of the negotiation of the sale of the Company, where (as revealed in the Proxy Statement and discussed herein) the Board tilted the sales process in favor of Exelon, the deal protection terms of the Merger Agreement are inappropriate.

66.     *No-Solicitation Provision*: The Merger Agreement contains a broad no-solicitation provision prohibiting the Company from seeking alternative bids for the Company. Such a clause is unreasonably restrictive in the context of a sales process that, as described below, involved only the limited number of eight potential bidders, of which only two were invited to the second phase of the sales process, and which included the use of "standstill"

agreements to limit and/or prohibit the ability of interested parties from being involved in the bidding process.

67.    *Matching Rights Provision*:   The Merger Agreement contains an unreasonable matching rights provision stating that in the event the Company receives a superior, unsolicited bid and seeks to change its recommendation in favor of the Proposed Transaction, Pepco is obliged to inform Exelon, at Exelon's request, of the identity of the bidder and terms of the bid, and to provide Exelon with an opportunity to match that improved offer.   Such a matching rights provision deters potential suitors and, as with the no-solicitation clause, is entirely inappropriate in the context of the sales process undertaken by the Board.

68.    *Termination Fee*:   Although the Board is permitted to terminate the Merger Agreement in the event of a superior, unsolicited bid, the Board can only do so if it pays to Exelon a termination fee of either:  (a) $259 million; or (b) $293 million and up to $40 million in expenses if the alternative bid is from a party who proposed to buy the Company after April 1, 2014 (collectively, the "Termination Fee").  The Termination Fee improperly limits the ability of the Board to undertake its fiduciary duty to maximize value to the Company's stockholders in a sale of the Company and, in some respects, is specifically designed to prevent a superior bid from an entity known to have expressed an interest in buying the Company.  The Termination Fee is therefore entirely inappropriate given the circumstances of the sales process undertaken by the Board.

Omissions From the Proxy Statement

69.    The Proxy Statement omits material information necessary for the Company's public stockholders to be properly informed prior to voting on the proposal to adopt the Merger Agreement.  The omitted information is essential to the general mix of information available to the Company's stockholders.

*Background of the Merger*

70.     The Background of the Merger section in the Proxy Statement fails to detail critical information necessary for the Company's public stockholders to understand if the Board properly undertook its fiduciary duties to maximize value in a sale of the Company.   The following information should be disclosed:

a.      The existence and extent of any prior relationship between Rigby and Crane, Exelon's CEO and President, prior to their initial January 2014 meeting;

b.      Whether or not Lazard was officially engaged to act as the financial advisor for the Proposed Transaction;

c.      The rationale for  engaging Morgan Stanley as an additional financial advisor;

d.      The details of the "interest expressed" by Bidder A, whether Bidder A was a financial or strategic buyer, and the existence and extent of any prior relationship between Rigby and Bidder A or its directors and/or managers, prior to its initial expression of interest;

e.      The  details of the "long-term strategic plan" and other "strategic transaction" the Board and Lazard discussed at the February 26, 2014 meeting;

f.      The number of other companies or other entities, including private equity entities, that the Board identified as possible acquirers or financiers of Pepco as discussed at the February 26, 2014 Board meeting;

g.      The reasons for the Board's February 27, 2014 decision to limit the pool of potential bidders to eight strategic parties and no private equity parties;

h.      The reason why Bidder A lost interest in Pepco;

i.    The reasons for the Board's April 3, 2014 decision not to invite Bidders B, C, and E to Phase II of the sales process;

j.    A summary of differences between the updated base case and regulatory upside case projections provided by management and the reason for these differences that the Finance committee reviewed on April 3, 2014;

k.    The reasons for the Board's April 27, 2014 decision to accelerate the bidding process;

l.    The reasons for the Board's April 27, 2014 decision that it would be impractical to accelerate the timing for reaching final agreement with both Exelon and Bidder D simultaneously;

m.    The reason for waiving the "don't ask, don't waive" standstill provisions on April 29, 2014 with respect to Bidders B, C and E, but not Bidder D;

n.    The details, including compensation or change in compensation under Rigby's extension employment agreement;

o.    The services to Exelon and Pepco provided by Morgan Stanley in accord with the stated two-year fee figures; and

p.    The reasons the Merger Agreement contains a provision increasing the termination fee payable in certain circumstances from $259 million to $293 million plus certain expenses incurred by Exelon.

*Opinion of Lazard Frères & Co. LLC*

71.    The Company engaged Lazard Frères & Co. LLC ("Lazard") to provide the Company with financial advisory services and a fairness opinion in connection with the Merger. Lazard delivered its Fairness Opinion on April 29, 2014. Lazard's Fairness Opinion omitted

material information necessary for the Company's public stockholders to make a fully informed decision regarding whether or not to vote in favor of the Merger. Without disclosure of the following information, the Company's public stockholders are unable to either understand Lazard's Opinion or assess its credibility:

a. A summary with the Company's fully diluted shares outstanding, cash, debt, equity and enterprise values at both the unaffected and offer price, and whether pricing multiples were calculated;

b. An explanation of the objective selection criteria used to identify companies in Lazard's *Selected Comparable Company Multiples Analysis*;

c. The individual multiples derived from the specific companies, and the separate share value ranges indicated from these multiples in Lazard's *Selected Comparable Company Multiples Analysis*;

d. An explanation of the "professional judgment" utilized by Lazard in selecting the reference ranges of multiples in its *Selected Comparable Company Multiples Analysis*;

e. The precise terminal value of Pepco as derived by Lazard in its *Discounted Cash Flow Analysis*;

f. The actual price per share ranges implied from Lazard's calculation in its *Discounted Cash Flow Analysis* before averaging to determine the implied price per share range;

g. The assumptions governing the calculation of unlevered free cash flows and a reconciliation of net income to the unlevered free cash flows in its *Discounted Cash Flow Analysis*;

h.      The sources and details of the weighted average cost of capital in its *Discounted Cash Flow Analysis*;

i.      An explanation of the objective selection criteria used to identify transactions and whether transactions were excluded for lack of available pricing multiples in Lazard's *Precedent Transactions Analysis*;

j.      The individual multiples derived from each transaction and the size of each transaction examined in Lazard's *Precedent Transactions Analysis*;

k.      An explanation of the "professional judgment" utilized by Lazard when applying multiple ranges to estimated earnings per share ("EPS") of Pepco in its *Precedent Transactions Analysis*;

l.      The expected future dividends per share of Pepco common stock expected to be paid by Pepco and details of cost-of-equity assumption that were utilized in Lazard's *Dividend Discount Analysis*; and

m.      Whether the Fairness Opinion was based on management's "base case" financial forecast or the Regulatory Upside Case projections.

*Opinion of Morgan Stanley & Co. LLC*

72.      The Board engaged Morgan Stanley & Co. LLC ("Morgan Stanley") to act as its financial advisor in connection with the Merger.  Morgan Stanley's Fairness Opinion omitted material information necessary for the Company's public stockholders to make a fully informed decision regarding whether or not to vote in favor of the Merger.  Without disclosure of the following information, the Company's public stockholders are unable to either understand Morgan Stanley's Opinion or assess its credibility:

a.     A summary with the Company's fully diluted shares outstanding, cash, debt, equity and enterprise values at both the unaffected and offer price, and whether pricing multiples were calculated;

b.     An explanation of the "judgment" and "judgments and assumptions" made by Morgan Stanley in its *Comparable Public Companies Analysis*;

c.     The individual multiples derived from the specific companies, and the separate share value ranges indicated from these multiples in Morgan Stanley's *Comparable Public Companies Analysis*;

d.     An explanation of the objective selection criteria used to identify transactions and whether transactions were excluded for lack of available pricing multiples in Morgan Stanley's *Precedent Transactions Analysis*;

e.     The individual multiples derived from each transaction and the size of each transaction examined in Morgan Stanley's *Precedent Transactions Analysis*;

f.     Details of the "cash flows" utilized by Morgan Stanley in its *Discounted Cash Flow Analysis*;

g.     An explanation of the "judgment" made by Morgan Stanley in determining the "discount rates" in its *Discounted Cash Flow Analysis* actual discount rates used; and

h.     Whether the Fairness Opinion was based on management's "base case" financial forecast or the Regulatory Upside Case projections.

*Management's Financial Projections*

73.     The Proxy Statement frequently refers to financial projections of management. Such projections provide critical information concerning the Pepco's view of its long-term standalone prospects to Company's public stockholders to make a fully informed decision regarding whether or not to vote in favor of the Merger. The following information should be disclosed:

      a.  A summary that includes  unlevered free cash flow, shares outstanding, equity issuances (including assumed terms), net operating loss balances and utilization and projected synergies;

      b.  An explanation of the assumed decreased lag for rate case decisions;

      c.  An explanation and quantification of New Jersey tax adjustments, as well as an explanation on how changes in regulatory assumptions affects such taxes;

      d.  The length of the assumed period between signing and closing;

      e.   A description of the Two-Year Rate Case Deferral case; and

      f.  An explanation for the different assumptions regarding reliability capital expenditures.

Interests of the Individual Defendants in the Proposed Transaction

74.     Rigby is anticipated to receive significant benefits pursuant to the Proposed Transaction not shared by the Company's public stockholders.  For example, the Proxy Statement reveals that in an apparent reaction to the Merger Agreement, Rigby's employment was extended until April 2016, and therefore beyond the "first half of 2015" as was announced by the Company in its January 27, 2014 press release.

75.     Rigby is further anticipated to receive millions of dollars in payments associated with the Proposed Transaction.  For example, the Proxy Statement reveals that as a result of the

Proposed Transaction, Rigby is to receive "unvested RSU awards," and "Executive Income Compensation" worth millions of dollars in addition to thousands of shares of Company restricted stock granted pursuant to the extension of his employment.  Such payments create a conflict of interest which calls into question the ability of Rigby to fulfill his fiduciary duties to the Company's public stockholders.

**COUNT I**

**Individual Claim for Violations of Section 14(a) of the 1934 Act**
**(Against the Individual Defendants and Pepco)**

76.    Plaintiff brings this claim on his own behalf and repeats and realleges each and every allegation contained above as if fully set forth herein.

77.    Rule 14a-9, promulgated by the SEC pursuant to § 14(a) of the 1934 Act, provides, in relevant part:  "No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which . . . is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

78.    As discussed above, Pepco filed and delivered the Proxy Statement to its stockholders, which the Individual Defendants knew, or recklessly disregarded, that it contained numerous material omissions and misstatements.

79.    The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  The Proxy Statement misrepresented and/or omitted material facts, including material information about the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company.

80.    In doing so, the Individual Defendants misrepresented and omitted material facts necessary to make the statements contained in the Proxy Statement not misleading, in violation

of § 14(a) of the 1934 Act.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy Statement, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

81.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding whether to vote their shares or seek appraisal.  In addition, a reasonable investor would view full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

82.     By reason of the foregoing, the Individual Defendants and Pepco have violated Section 14(a) of the 1934 Act.

## COUNT II

### Individual Claim for Violations of Section 20(a) of the 1934 Act
### (Against the Individual Defendants)

83.     Plaintiff brings this claim on his own behalf and repeats and realleges each and every allegation contained above as if fully set forth herein.

84.     The Individual Defendants acted as controlling persons of Pepco within the meaning of § 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors and/or controlling stockholders and/or advisors of Pepco, and/or their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

85.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86.   In particular, each of the Individual Defendants had direct and/or supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of this document.

87.   The Individual Defendants had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

88.   In addition, as the Proxy Statement sets forth at length, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy Statement purports to describe the various issues and information that they reviewed and considered.

89.   By virtue of the foregoing, Defendants have violated § 20(a) of the 1934 Act.

90.   As set forth above, Defendants had the ability to exercise control over, and did exercise control over, a person or persons who have each violated § 14(a) of the 1934 Act and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the 1934 Act.  As

a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT III

### Class Claim for Breaches of Fiduciary Duties
### (Against the Individual Defendants)

91.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.     The Individual Defendants have violated their fiduciary duties owed to Plaintiff and the Class.  By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants are attempting to unfairly deprive Plaintiff and the Class of the value of their investment in Pepco.

93.     As demonstrated by the above allegations, the Individual Defendants have failed to exercise the necessary care required and have therefore breached their duty of loyalty because, *inter alia*:

      a.     They have failed to properly value the Company;

      b.     They have failed to take steps to maximize the value of Pepco for its public stockholders; and

      c.     They have filed the misleading and incomplete Proxy Statement designed to mislead Company stockholders as to the process leading up to the Proposed Transaction and the value of Pepco.

94.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, which will deprive the Class of its fair and proportionate share of Pepco's valuable assets and businesses, to the irreparable harm of the Class.

95.     Plaintiff and the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that the Individual Defendants' actions threaten to inflict.

## COUNT IV

### Class Claim for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duties (Against Pepco, Exelon, and Merger Sub)

96.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.     Pepco, Exelon, and Merger Sub, by reason of their status as parties to the Merger Agreement and/or their possession of non-public information, have aided and abetted the Individual Defendants in the aforesaid breaches of their fiduciary duties.

98.     Such breaches of fiduciary duties could not, and would not, have occurred but for the conduct of Pepco, Exelon, and Merger Sub who, therefore, have aided and abetted such breaches in the possible sale of Pepco to Exelon.

99.     As a result of the unlawful actions of Pepco, Exelon, and Merger Sub, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive fair value for Pepco's assets and business.  Unless the actions of Pepco, Exelon, and Merger Sub are enjoined, they will continue to aid and abet the Individual Defendants' breaches of their fiduciary duties owed to Plaintiff and the Class.

100.     Plaintiff and the Class have no adequate remedy at law.

## DEMAND FOR TRIAL BY JURY

101.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands injunctive relief, in Plaintiff's favor and in favor of the Class and against Defendants, as follows:

A.      Declaring that Plaintiff's fiduciary duty claims (Counts III and IV) are properly maintainable as a class action;

B.      Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until they comply with all fiduciary duties to maximize stockholder value and fully disclose all material information in their possession, and duties under §§ 14(a) and 20(a) of the 1934 Act to provide stockholders with all material information relating to the unfair sales process, the conflicts of interest suffered by Defendants in connection with the Proposed Transaction, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company;

C.      Directing Defendants to account to Plaintiff and the Class for all damages suffered by them as a result of Defendants' wrongful conduct alleged herein;

D.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

Dated: August 12, 2014

**CROSS & SIMON, LLC**

_____

Richard H. Cross, Jr. (No. 3576)
Christopher P. Simon (No. 3697)
1105 N. Market Street, Suite 901
Wilmington, DE  19801
(302) 777-4200
(302) 777-4224
rcross@crosslaw.com
csimon@crosslaw.com

*Of Counsel:*

GLANCY BINKOW & GOLDBERG LLP
Louis Boyarsky
Leanne Heine
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
(310) 201-9150

*Counsel for Plaintiffs*